UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

BRENT ALAN BRIDGES,

          Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

        Defendant.

Case No. 6:11-cv-06342-ST

FINDINGS AND RECOMMENDATION

STEWART, Magistrate Judge.

## INTRODUCTION

Plaintiff, Brent Alan Bridges, ("Bridges"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying his applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-

33, and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-

1 - FINDINGS AND RECOMMENDATION

83f.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC §§ 405(g) and  1383(c)(3).  For the reasons set forth below, that decision should be reversed and remanded for further administrative proceedings.

## ADMINISTRATIVE HISTORY

On November 1, 2004, Bridges filed an application for DIB and SSI, alleging a disability onset date of September 5, 2004.  Tr. 82-84, 417.[1]  His applications were denied initially and on reconsideration.  Tr. 417.  On November 21, 2007, a hearing was held before Administrative Law Judge ("ALJ") William L. Stewart, Jr.  Tr. 570-602.  On December 28, 2007,  ALJ Stewart issued a decision finding Bridges not disabled.  Tr. 417-37.  Bridges appealed, and on March 22, 2010, the Appeals Council remanded the matter back to the ALJ with specific instructions to:  review Bridges' mental impairments; further evaluate the opinion of the treating physician, Michael E. Garfinkel, M.D.; obtain evidence from a vocational expert on the number of jobs available in the national economy and identify and resolve any conflicts between that evidence and the Dictionary of Occupational Titles; and obtain evidence from a mental health professional to determine the severity of Bridges' mental health impairments and whether drug addiction and/or alcoholism is a contributing material factor to the determination of disability.  Tr.  30-32.

On June 19, 2010, a second hearing was held before ALJ James Yellowtail.   Tr. 603-40.  On July 20, 2010, ALJ Yellowtail issued a partially favorable decision finding that Bridges was disabled on and after June 18, 2010, granting him SSI from that date and denying him DIB

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on April 3, 2012 (docket # 12).

2 - FINDINGS AND RECOMMENDATION

based upon a date last insured of December 31, 2006.  Tr. 20-28.   Bridges requested review,

and on August 26, 2011, the Appeals Counsel found no reason to review ALJ Yellowtail's

decision.  Tr.9-11.  Therefore, the ALJ's July 20, 2010, decision is the Commissioner's final

decision subject to review by this court.  20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in 1955, Bridges was 54 years old  at the time of the second hearing after remand.

Tr. 82.  Bridges has a high school education and past relevant work experience as a lot

attendant, plumbing laborer, and mobile home set-up laborer.  Tr. 103-07, 633.  He alleges that

he is unable to work due to the combined impairments of diabetes mellitus, hepatitis C, obesity,

history of Methicillin-resistant Staphylococcus Aureus ("MRSA") infection associated with

intravenous methamphetamine use, hypertension, history of methamphetamine use, alcohol

abuse, depression, social phobia, and anxiety.  Tr. 419.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months[.]"  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled under the meaning of the Act.  20 CFR § 404.1520;

*Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful

activity.  If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(I) & (b), 416.920(b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.920(c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996). In making a RFC finding, the ALJ must consider all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 CFR §§ 404.1529, 416.929.

In considering the claimant's symptoms, the ALJ must follow a two-step process. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment, *i.e.*, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's pain or other symptoms. SSR No. 96-7p, at 6, 1996 WL 374186 (July 2, 1996). Second, the

ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. *Id*. For the latter inquiry, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id*.

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960©.

///

///

///

///

**ALJ'S FINDINGS**

At step one, the ALJ concluded that Bridges has not engaged in substantial gainful activity since September 5, 2004, the alleged onset date.  Tr. 23.

At step two, the ALJ concluded that Bridges has the severe impairments of diabetes, obesity, dysthymic disorder, social phobia, and personality disorder.  *Id*.  The ALJ found Bridges' substance abuse history,  Hepatitis C, and  hypertension to be non-severe impairments. *Id*.  He also noted that Bridges had not suffered a MRSA infection in the year before the hearing.  *Id*.  At step three, the ALJ concluded that Bridges does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  *Id*.

The ALJ found that Bridges has the RFC to perform light work, with the following limitations:

> able to lift 20 pounds occasionally and 10 pounds frequently; able to stand or walk or sit for 6 hours; limited to occasional climbing stairs or ramps, balancing, stooping, kneeling, crouching, and crawling; limited to unskilled work defined as routine repetitive tasks with simple instructions that does not require more than brief contact with the general public.

Tr. 24.

Based upon the testimony of a VE, the ALJ determined at step four that Bridge's RFC precluded him from returning to his past relevant work.  Tr. 26.

At step five, the ALJ found that considering Bridge's age, education, and RFC, he was capable of performing the requirements of representative unskilled light occupations, such as small products assembler, electronics worker, or packing line worker.  Tr. 27.

Accordingly, the ALJ determined that Bridges was not disabled prior to June 18, 2010, when his age category changed. *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FINDINGS

Bridges argues that the ALJ erred by failing to give sufficient reasons to reject his subjective testimony, his wife's testimony and the disability opinion of his treating physician. He also argues that the ALJ erred by accepting the testimony of the vocational expert ("VE") which deviated from the Dictionary of Occupational Titles ("DOT") without any explanation for the deviation.

I.    **Bridges' Credibility**

Bridges first contends that the ALJ improperly discounted his testimony regarding the severity of his symptoms. When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 CFR § 404.1529. A determination that the claimant's report is not credible must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*). Unless the record includes affirmative evidence of malingering, the ALJ must offer specific, clear, and convincing reasons for rejecting the claimant's testimony about the severity of his symptoms. *Carmickle v. Comm'r*, 533 F3d 1155, 1160 (9th Cir 2008). "General findings are insufficient; rather the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F3d 821, 825 (9th Cir 1995), citing *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).

When evaluating credibility, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996). In weighing credibility, the ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id*; *see also* SSR 96-7p; 1996 WL 374186 (July 2, 1996).

In a Function Report dated December 31, 2004, Bridges wrote that he did not go outside his home, sometimes for days at a time. Tr. 114. He described "a hard time coping with depression and blood sugars," an inability to "join in social activities or go somewear [*sic*] new without having [*sic*] panic attacks," and a "fear of large crowds." Tr. 116-17. With respect to his physical limitations, Bridges reported an inability to do jobs for more than one or two hours that require heavy lifting, squatting, bending, standing, walking, or kneeling. Tr. 116.

In a Claimant Fatigue Questionnaire of the same date, Bridges reported that he "stays in bed all day long most days" and is active "two or three hours depending on activ[ity]" before he needs to rest. Tr. 119. He reported feeling "sad and depressed most days" and often "fatigued," sick to his stomach, "irritable," and "anxious." Tr. 121. Although sometimes trying to do household chores, he rarely could complete them due to fatigue. *Id*.

At the first hearing on November 21, 2007, Bridges testified that because of pain and fatigue, his capacity for walking had diminished since December 31, 2004. Tr. 583. He was starting to lose sensation in his feet and experienced more overall tiredness and fatigue. Tr. 577. He did not help much around the house because he loses interest in doing things, gets winded and fatigued easily, and isolates from others in his family. Tr. 579. Due to his depression, Bridges did not take very good care of himself and could not get himself to go out.

9 - FINDINGS AND RECOMMENDATION

Tr. 575, 590.  He sought solitude and stayed in his room "sometimes weeks at a time."  Tr. 575, 588, 590.

Bridges testified he could lift possibly 40 pounds, stand for possibly two hours, and sit for four hours, but not when he is isolating himself.  Tr. 590.  Because his blood sugar is not well controlled, he feels weak and fatigued, angers very easily and suffers mood swings.  Tr. 591.

The first ALJ found that Bridges' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  Tr. 423.  The second ALJ made a similar finding, but used slightly different wording.  He found that Bridges' "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."  Tr. 25.

Bridges contends that the second ALJ erred by putting the cart before the horse because he concluded Bridges was not credible due to the conflict between his testimony and the RFC. Bridges is correct that "an ALJ may not simply define an RFC and then, without more, conclude the claimant's testimony is only credible to the extent it aligns with the RFC.  However, '[t]here is nothing wrong with an ALJ stating a conclusion and then explaining it, as opposed to providing [an] explanation and then reaching a conclusion.'"  *Bostic v. Astrue*, No. 3:10-cv-1153-HU, 2012 WL 786909, at *1 (D Or Mar. 9, 2012), citing *Black v. Astrue*, No. 3:10-cv-06409-MO, 2011 WL 6130534, at *6 (D Or Dec. 7, 2011).  In other words, the ALJ does not err simply by noting that a claimant's testimony is not credible to the extent it is inconsistent with the RFC when that conclusion is followed by sufficient reasoning.

Since the record contains no affirmative evidence of malingering, the ALJ was required to provide clear and convincing reasons to reject Bridges' testimony regarding the severity of his symptoms.  However, the ALJ did not identify what evidence undermines Bridges' complaints.  Instead he explained only that Bridges' "prior testimony and his statements throughout the disability application process are generally credible.  With the exception of answering my questions as to infections, the claimant chose not to provide additional testimony at the recent hearing."  *Id.*  It is far from clear why the ALJ believed that Bridges was not credible based on his "generally credible" prior testimony and lack of additional testimony.

The Commissioner asserts that the ALJ's assessment of Bridges' credibility was supported by the medical record and other evidence, such as Bridges' admitted substance abuse and history of noncompliance with medical treatment for diabetes, hypertension, and depression.  These are the same reasons given by the ALJ after the first hearing when finding Bridges not entirely credible.  Tr.  423-25.  However, after the second hearing, the ALJ did not make these same findings or, for that matter, any other specific findings.  The second ALJ may have intended to incorporate the reasons previously given by the first ALJ, but did not do so. The reviewing court may not rely upon reasoning the ALJ did not assert.  *Connett v. Barnhart*, 340 F3d 871, 874 (9th Cir 2003), citing *SEC v. Chenery Corp.,* 332 US 194, 196 (1947). Although the ALJ's conclusion may be correct based on substantial evidence in the record, he committed legal error by failing to give specific, clear and convincing reasons to reject Bridges' testimony as to his symptoms.

II.    **Credibility of Bridges' Wife**

Bridges also argues the ALJ erred in ignoring the testimony of Bridges' wife.

Testimony of lay witnesses, including family members, about their own observations regarding

the claimant's impairments must be considered by the ALJ. *Smolen*, 80 F3d at 1288.

Testimony from lay witnesses who see the claimant on a regular basis is of particular value

because they can often ascertain whether the claimant is malingering or truly suffering. *Dodrill*,

12 F3d at 919. If an ALJ chooses to discount the statements of lay witnesses, the ALJ must give

"germane reasons." *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). "[W]here the ALJ's error

lies in a failure to properly discuss competent lay testimony favorable to the claimant, a

reviewing court cannot consider the error harmless unless it can confidently conclude that no

reasonable ALJ, when fully crediting the testimony, could have reached a different disability

determination." *Stout v. Comm'r*, 454 F3d 1050, 1056 (9th Cir 2006).

In a Function Report dated December 15, 2004, Mrs. Bridges stated she had known her

husband for about 30 years. Tr. 95. For his daily routine, she wrote:

> Many days he doesn't get up until afternoon, takes medication and blood
> sugars, may read the newspaper or turn on t.v., occasionally will start a
> task. He doesn't always finish it though. Doesn't join family for meals.
> Usually eats in bedroom or just lays in bed napping or just laying there,
> sometimes with t.v. running for noise.

*Id*.

She also reported that Bridges was not tending to his personal hygiene, did not do much

housework because of lack of interest and lack of energy, and did not like to attend social

functions. Tr. 96, 97, 100. He occasionally watched a movie with the family, but did not

always finish it before laying down in his room.  Tr. 99.  Mrs. Bridges described her husband as irritable and shutting everyone out when under stress and unable to stay on task for more than one to two hours at a time.  Tr. 100-01.

Nearly three years later at the November 21, 2007 hearing, she described Bridges' mood as "solemn and withdrawn, just, like, non-communicative. You can't communicate with him many days."  Tr. 593.  When he "does make an effort to come out and try to interact with the family, he often finds himself, like, getting upset easily over just any little thing.  And retreats back to the room."  *Id*.  Bridges gets upset and irritable easily, to the extent that he cannot watch an entire movie with the family or sit down for a meal without retreating to his room.  Tr. 594.  Previously, her husband would go for long walks and hikes and liked to socialize, but now spends the majority of his time in his room and lacks the social skills to interact even with his family.  Tr. 594, 596.  Mrs. Bridges noted that her husband is inconsistent in caring for his diabetes and gets irritated when she reminds him to take care of himself.  Tr. 595.

After summarizing Mrs. Bridges' written and oral testimony, the first ALJ found her "reasonably credible," but "largely congruent" with the RFC assessment.  Tr. 422-23.  He explained that Bridges "isolation and withdrawal are not accepted as demonstrating an inability to get out to work" and that the RFC excluded the "remediable" impact of being "noncompliant with medication."  Tr. 423.  However, the second ALJ did not mention Mrs. Bridges at all.  He may have intended to incorporate the first ALJ's summary and findings, but did not do so.

As the Commissioner notes, when assessing Bridges' RFC, the second ALJ did state that he had considered the evidence in accordance with the requirements of SSR 06-3p, which

explains how the Commissioner evaluates evidence from various types of non-medical sources, including spouses.  Tr. 21.  The Commissioner argues that this statement indicates the ALJ sufficiently accounted for the evidence from Mrs. Bridges.

The ALJ did incorporate many of the work-related limitations described by Mrs. Bridges into his RFC determination by limiting Bridges to routine tasks with simple instructions and only brief contact with the public.  However, in total, Mrs. Bridges' testimony suggests that Bridges is incapacitated from working by the combination of his physical and mental limitations.  Because the ALJ failed to find Bridges incapacitated, the ALJ must have rejected at least some of her testimony, but failed to provide any reason for doing so.  This court may not affirm silent rejection of lay testimony unless it can confidently conclude that no ALJ, when fully crediting that testimony, would reach a different disability determination.  *Stout*, 454 F3d at 1055-56.

The issue here is whether Bridges' isolation, withdrawal, and inability to stay on task, as described by Mrs. Bridges, supports his inability to work or instead may be remedied by compliance with medical treatment. Given that the record contains evidence to support both conclusions, as discussed below, this court is far from confident that no ALJ would reach a different disability determination.  Although the ALJ's conclusion may be correct based on substantial evidence in the record, he committed legal error by not discussing Mrs. Bridges' testimony.

///

///

### III.    Treating Physician's Opinion

Finally, Bridges asserts that the ALJ did not give sufficient reasons to reject the disability opinion of his treating physician, Dr. Garfinkel.  The ALJ is the "final arbiter" of ambiguities in medical evidence.  *Tommasetti*, 533 F3d at 1040.  When determining the proper weight to give a doctor's opinion, the ALJ should examine several factors, including the length of the treatment relationship, the frequency of examination, evidence that supports the doctor's opinion, the consistency of the doctor's opinion with the record as a whole, and the doctor's relevant area of specialty.  *Orn v. Astrue*, 495 F3d 625, 631 (9th Cir 2007), citing 20 CFR § 404.1527(d).  Thus, as a general rule, "the opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant."  *Id* at 632, quoting *Reddick*, 157 F3d at 725.  Accordingly, "even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record."  *Id* (internal quotation marks omitted).

"Specific and legitimate reasons" can include a treating physician's reliance on the claimant's discredited subjective complaints or inconsistency between the physician's opinion and the objective medical records.  *See Tommasetti*, 533 F3d at 1041.  "Substantial evidence" is such evidence as a reasonable mind might require to support a conclusion:  more than a scintilla but less than a preponderance.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F3d 685, 690 (9th Cir 2009), quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F2d 573, 576 (9th Cir 1988).  Thus, the ALJ's rationale for disregarding a treating physician's opinion – no matter how specific –  must meet certain evidentiary standards for reasonableness.  For example, "the

opinion of a non-examining physician alone cannot constitute substantial evidence to justify

disregarding a treating physician's opinion." *Lester*, 81 F3d at 831. The ALJ must have some

corroborating basis, whether from medical records or otherwise, that sways the weight of the

evidence against the treating physician's opinion. *Id*.

Dr. Garfinkel began treating Bridges in 2002. Tr. 339. On August 29, 2007, Dr.

Garfinkel conducted a physical examination of Bridges. Tr. 394-96. On October 11, 2007, in

response to questions from Bridges' attorney, he listed multiple diagnoses, including insulin

dependent Type II diabetes, hypertension, depression, chronic hepatitis C infection, obesity, and

history of substance abuse. Tr. 407. The diagnoses were based upon laboratory results,

Bridges' medical history, and the physical examination. *Id*. He stated that Bridges' "symptoms

can vary based on the patient's compliance with advised treatment and control of ongoing

medical problems. Can see fatigue, lethargy, increased thirst, mood depression, etc." *Id*. As a

result, Dr. Garfinkel opined that Bridges could not perform "light work" as defined by the SSA

regulations because his "multiple medical conditions would interfere with the work as described

for 'light work,' especially due to fatigue or work absences." Tr. 408. Dr. Garfinkel believed

Bridges could tolerate sedentary work, but was "unsure if there would be excessive absences

given the uncertainty of [illegible]." *Id*. Unfortunately the last part of this sentence was cut off

of the copy of the report contained in the record. However, the first ALJ considered and

described Dr. Garfinkel's opinion as expressing "some uncertainty regarding excessive absences

due to the claimant's control of his medical problems." Tr. 425. Based on that description, this

court presumes that Dr. Garfinkel linked excessive absences to noncompliance with medical treatment.

The ALJ rejected Dr. Garfinkel's opinion for several reasons. First, he noted that when Dr. Garfinkel issued his 2007 opinion, Bridges "was a regular user of methamphetamine and alcohol," resulting in "non-compliance issues undermining the effectiveness of prescribed treatment." Tr. 25. The ALJ noted that this conclusion was confirmed by other medical providers and Bridges himself both before and after he became clean and sober. *Id.* Bridges does not challenge this reason.

Second, the ALJ found Dr. Garfinkel's opinion to be conclusory because it cited "no objective medical findings, tests, or treatment notes that would support this proposed distinction between capacity for sedentary work rather than light work." *Id.* Additionally, he noted that:

> Dr. Garfinkel's opinion is inherently inconsistent referring to there being absences for medical reasons, and in the next paragraph stating that he is unsure if there would be excessive absences. Since the claimant's only physical problem is diabetes, which may be aggravated by obesity, and this problem is medically controlled according to treatment records, there is very little room for greater exertional restrictions that those found here.

*Id.*

Bridges argues that the ALJ was wrong about the absence of objective medical findings, given that Dr. Garfinkel had performed a physical examination of Bridges shortly before issuing his opinion. However, Dr. Garfinkel did not identify any musculoskeletal or neurological findings in that physical examination or elsewhere to support his opinion that Bridges was limited to sedentary work. Instead, Dr. Garfinkel appeared to rely only on Bridges' fatigue and

work absences to eliminate light work.  It is not clear how or why Dr. Garfinkel concluded that

Bridges' "multiple medical conditions" of diabetes, hypertension, chronic hepatitis C infection

and obesity, if controlled by medications, would interfere with an ability to perform light work.

From the phrase "especially due to fatigue and work absence," it appears that he relied primarily

on Bridges' depression and noncompliance with medical treatment as leading to fatigue and

work absences which would bar light work.  In any event, as found by the ALJ, it is far from

clear how or why Dr. Garfinkel drew a distinction between light and sedentary work based on

the nonexertional limitations of fatigue and work absences which would affect both, as opposed

to exertional limitations.

      Bridges also contends that, contrary to the ALJ's conclusion, Bridges' diabetes and other

medical conditions were not well controlled during the relevant time period.  Substantial

evidence in the record supports that contention.

      On September 17, 2004, Bridges had "very poorly controlled diabetes," impaired liver

function and depression with poor sleep patterns.  Tr. 249.  On January 13, 2005, he was treated

for cellulitis and an abscess in his right thigh and had elevated blood glucose. Tr. 278.

      On January 17, 2006, his diabetes was noted as "currently out of control."  Tr. 350.  On

February 4, 2006, Bridges reported that due to depression, he had a great difficulty following

through with his health care.  Tr. 492.  On September 5, 2006, it was noted that his medical

problems over the past five years, "including several hospitalizations for MRSA, an infected

hip, a big Staph abscess on one arm, acute renal failure related to all the above, and even

congestive heart failure," had improved, but he still suffered from fatigue.  Tr. 363.  At that

time, his chronic hepatitis C was "doing reasonably well." *Id.*  However, compliance issues remained a problem.  *Id.*

At the physical examination on August 29, 2007, Bridges reported that he was "not doing particularly well" and had not been "particularly compliant." Tr. 394.  Dr. Garfinkel noted that a "number of [his] symptoms have to do with his generalized sense of a lack of well being, the mental health issues and some urinary symptoms which I think likely have to do with the poor control of his diabetes and GI symptoms."  *Id.*

On September 24, 2007, another treating physician, Gregory L. Knecht, MD, wrote that Bridges' "biggest problem now is one of significant depression." Tr. 41.  Additionally, he noted that Bridges has "a loss of interest in activities, loss of interest in compliance with his health care and has significant comorbidities including obesity, diabetes, hyperlipidemia and a history of" a MRSA infection with acute renal failure that had returned to normal.  *Id.*

On October 20, 2008, Bridges has an abscess treated.  Tr. 529.  On May 11, 2009, he was treated again for an abscess.  Tr. 526-27.

On January 25, 2010, his hypertension was "poorly controlled," his diabetes control was "uncertain,"and medication was prescribed for his depression.  Tr. 521.  The next month, treating physician Ralph Fillingame, M.D., reported that Bridge's depression was "doing okay." Tr. 519.  Also in February 2010, Bridges began diabetes education due to a "new commitment to learn and followup." Tr. 488.  Although his blood sugars improved, he reported "being very tired and not really being able to get out the door to do any exercise." Tr. 486.  In March 2010, Bridges reported continuing depression.  In April 2010, Bridges' depression worsened, although

his blood sugars were well controlled, prompting Dr. Fillingame to change his anti-depressant medication.  Tr. 485, 510-12, 514.   On May 8, 2010, Bridges was "still not feeling any better in terms of depression" and also complained of being short of breath and easily fatigued.  Tr. 507-08.  Dr. Fillingame assessed depression with some agitation and fatigue, and dyspnea with exertion, but noted that his hypertension was controlled.  Tr. 508, 510.   On April 27, 2010, Bridges' responses on the Beck Inventory yielded some thoughts that he had of "being better off dead."  Tr. 510.

These medical records dispute the notion that Bridges' diabetes and other medical conditions were adequately controlled during the relevant time period from September 2004 through June 2010.  Therefore, to the extent that the ALJ rejected Dr. Garfinkel's opinion because Bridges' diabetes "is medically controlled according to treatment records," he erred. Nonetheless, substantial evidence supports the conclusion that  Bridges' various medical conditions may be remedied by compliance with medical treatment.  The problem is that the record is unclear, and the ALJ did not explain, whether Bridges' ability to comply with medical treatment was directly and negatively impacted by his mental impairments.  *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F3d 1294, 1299 (9th Cir 1999) ('it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation" (citation omitted)).  If Bridges' mental impairments rendered him unable to comply with medical treatment, then his noncompliance would not be a legitimate reason to reject Dr. Garfinkel's opinion.

Third, the ALJ was more "persuaded by the reasoning and expertise of Dr. Lewy," a psychologist who had reviewed Bridges' entire medical treatment history and testified to a "significantly more current" opinion at the second hearing in June 2010. *Id.* With respect to Bridges' mental impairments, Dr. Lewy testified that Bridges had moderate restrictions in some work-related areas and that his drug and alcohol use were not material. Tr. 619-23. "The findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F3d 520, 522 (9th Cir 1996). As the ALJ correctly noted, Dr. Lewy's opinion, unlike Dr. Garfinkel's opinion, is much more recent and based on a review of Bridges' entire medical history. To that extent, the ALJ did not err by preferring Dr. Lewy over Dr. Garfinkel. However, Dr. Lewy did not address Bridges' other various medical problems and the interplay, if any, between Bridges' mental impairments and his noncompliance with medical treatment.

Finally, the ALJ noted that "one basis for Dr. Garfinkel's opinion at the time no longer exists, that being recurrent infections. As stated previously, records also indicate good control of the claimant's diabetes as well as his hypertension." Tr. 26. That left only Bridges' "mental health issues, which admittedly can relate to [the] compliance issue" and "are accommodated by" the work restrictions in the RFC. *Id*. Although the number of recurrent infections certainly decreased over time, as previously discussed, the record does not indicate "good control" of Bridges' diabetes as late as May 2010. Nonetheless, the ALJ did not err by finding that Bridges' lack of control of his diabetes and hypertension was due to noncompliance. Again,

however, the issue not addressed by the ALJ is how that noncompliance may be caused by the

mental health issues.

In sum, although some reasons may not be supported by substantial evidence in the

record, the ALJ provided other specific and legitimate reasons for rejecting the opinion of

Dr. Garfinkel limiting Bridges to sedentary work.

**VI.    Step Five Finding**

Bridges asserts that the ALJ erred at step five of the sequential evaluation process

because  the VE's testimony about the available jobs which would accommodate Bridges' RFC

was not consistent with the DOT.

At step five of the sequential evaluation process, the ALJ must consider the RFC of the

claimant in relation to the claimant's age, education, and work experience to determine whether

the claimant can perform any jobs that exist in significant numbers in the national economy.

*Yuckert*, 482 US at 142; 20 CFR §§ 404.1520(a)(4)(v) and (g), 404.1560(c).  The Commissioner

can meet this burden by relying on the testimony of a VE or by reference to the Medical-

Vocational Guidelines ("grids") set forth at 20 CFR Part 404, Subpt. P, appendix 2.   If the VE's

testimony as to the requirements of a position conflict with the DOT's specifications, the ALJ

has "'an affirmative responsibility' to inquire as to the reasons and evidentiary basis for the

VE's decision."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F3d 1219, 1234 (9th Cir 2009), citing

SSR 00-4p, 2000 WL 1898704 at *2 (Dec. 4, 2000); *Tommasetti*, 533 F3d at 1042.

Bridges challenges that portion of the ALJ's RFC which limits him to "unskilled work

defined as routine repetitive tasks with *simple instructions* that does not require more than brief

contact with the general public." Tr. 24 (emphasis added).  Based on the hypothetical question

posed to the VE with this restriction, the VE responded that Bridges could perform three jobs:

(1) electronics worker, DOT 726.687-010; (2) small products assembler, DOT 739.687-030;

and (3) packing line worker, DOT 753.687-038.  Tr. 637.   The ALJ relied on this testimony to

find Bridges not disabled.

   The DOT describes each of these three jobs as requiring Level Two reasoning  on the

scale of General Educational Development.  DOT, §§ 7, 9.  Level Two reasoning  in turn,

requires the ability to "apply commonsense understanding to carry out *detailed* but uninvolved

written or oral instructions."  DOT, App. C § III (emphasis added).

   According to Bridges, a job requiring Level Two reasoning "to carry out detailed but

uninvolved written or oral instructions" exceeds his RFC limited to "routine tasks with simple

instructions."  The Commissioner responds that Bridges' education is a vocational factor which

must be considered in conjunction with the RFC at step five.  20 CFR §§ 404.1405(a),

416.906(a).  Because Bridges obtained a high school education, he is presumed to have the

"abilities in reasoning arithmetic, and language skills acquired through formal schooling at a

12th grade level or above."  20 CFR §§ 404.1564(b)(4), 416.964(b)(4).  As such, the

Commissioner argues, Bridges' education enabled him to satisfactorily perform jobs with low-

level reasoning requirements, including a GED Level Two reasoning level.

   The Commissioner also points to the DOT's Specific Vocational Preparation ("SVP")

score of 2 for the three jobs suggested by the VE.  A job's SVP is focused on "the amount of

lapsed time" needed for a typical worker to learn the job's duties.  DOT, 1009.  A SVP of 2

indicates a typical worker would take no more than one month to learn the techniques, acquire

the information, and develop the facility needed for average performance.  DOT, 1009.  Work is

considered unskilled if a person can usually learn to the do the job in 30 days with little specific

vocational preparation.  20 CFR §§ 404.1568, 416.968.   Unskilled work corresponds to an SVP

of 1-2.  SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).  Therefore, the Commissioner

contends, the VE's testimony is consistent with the DOT for the three jobs identified by the VE

which have an SVP of 2.

However, as other courts have decided, the SVP level in a DOT listing for unskilled

work does not address whether a job entails simple, repetitive tasks.  *Meissl v. Barnhart*, 403 F

Supp2d 981,  983 (CD Cal 2005) (citations omitted).  "SVP ratings speak to the issue of the

level of vocational preparation necessary to perform the job, not directly to the issue of a job's

simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings."

*Id,* quoting *Hall-Grover v. Barnhart*, 2004 WL 1529283, at *4 (D Me April 30, 2004).  Here

Bridges' ability to perform unskilled work with "simple instructions" is not the same as an

ability to perform jobs with Level Two reasoning for carrying out "detailed" instructions.

The deviation of the VE's testimony from the DOT is acceptable only if the ALJ

questioned the VE regarding the deviation and then provided persuasive evidence to support the

finding that Bridges could perform those jobs despite their Level Two reasoning level.

However, the ALJ did not question the VE about the deviation between jobs with an SVP of 2

and Bridges' RFC limiting him to tasks with simple instructions, and the record contains no

justification for concluding that Bridges is capable of performing the three identified jobs

despite his RFC.  Accordingly, the ALJ erred by relying on the VE's testimony at step five.

**V.      <u>Remand</u>**

When the Commissioner's decision contains error, the court has discretion whether to

remand for further proceedings or for immediate payment of benefits.  *Harman v. Apfel*, 211

F3d 1172, 1178 (9th Cir), *cert. denied*, 531 US 1038 (2000).  A remand for an award of benefits

is appropriate when no useful purpose would be served by further administrative proceedings or

when the record has been fully developed and the evidence is insufficient to support the

Commissioner's decision.  *Strauss v. Comm'r*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting

*Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004).  The court may not award benefits

punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled.  *Id*

at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate

award of benefits directed where:  (1) the ALJ has failed to provide legally sufficient reasons for

rejecting such evidence; (2) there are no outstanding issues that must be resolved before a

determination of disability can be made; and (3) it is clear from the record that the ALJ would

be required to find the claimant disabled were such evidence credited.  *Id*.  The "credit-as-true"

doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in

determining whether to enter an award of benefits upon reversing the Commissioner's decision.

*Connett*, 340 F3d at 876.  The reviewing court should decline to credit testimony when

"outstanding issues" remain.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).  Where it is

not clear that the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett*, 340 3Fd at 876.

As discussed above, the ALJ failed to provide legally sufficient reasons for rejecting: (1) Bridges' testimony concerning the severity and intensity of symptoms of his physical and mental impairments; and (2) Mrs. Bridges' evidence about the effect of Bridges' symptoms, specifically his isolation, inability to interact socially, and difficulty completing tasks. Although the ALJ did not err by rejecting Dr. Garfinkel's opinion, he failed to adequately address the interplay between Bridges' mental impairments and his noncompliance with medical treatment for his physical impairments. However, even if the testimony of Bridges and his wife is found not credible and Bridges' mental impairments do not justify his noncompliance with medical treatment, then, the issue remains as to what work Bridges can perform if he complies with his medical treatment.

At the hearing, the VE was asked how absences of two days per month from employment to seek medical treatment for infections would affect Bridges' ability to perform the three jobs identified. The VE testified that such absences would preclude work in the national economy. While the hypothetical focused on absences for a medical issue which Bridges apparently no longer suffers, that number of absences for any reason would seem to preclude employment. The difficulty however, is that the record contains no specific evidence as to the number of absences Bridges might be expected to encounter if his multiple medical conditions were controlled by compliance with medical treatment. Moreover, the current

records fails to reveal what jobs may exist in the national economy within Bridges' RFC with the correct reasoning level.

Thus, a remand for further proceedings is warranted to require the ALJ to address the credibility of both Bridges and his wife and to allow the ALJ to elicit testimony from a VE to determine what work at the appropriate reasoning level in the national economy Bridges can perform. *See Burnsides v. Astrue*, 2010 WL 2730966 (D Or, July 9, 2010); *Pope v. Astrue*, 2011 WL 3584802 (D Or, May 20, 2011); *James v. Astrue*, Case No. 07-cv-6350-HA, Doc. #18 (D Or, Nov. 17, 2008).

## <u>RECOMMENDATION</u>

For the reasons discussed above, the Commissioner's decision should be REVERSED AND REMANDED pursuant to Sentence Four of 42 USC 405(g) for further proceedings.

## <u>SCHEDULING ORDER</u>

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due December 3, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 14th day of November, 2012.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

27 - FINDINGS AND RECOMMENDATION